(82 South. 707)

No. 22271.

RANSONET v. MENARD.

In re MENARD.

(June 2, 1919.   Rehearing Denied June 30, 1919.)

*(Syllabus by the Court.)*

1. MORTGAGES ⬯5—SALE OF PROPERTY— MORTGAGE OR DEED—CONSTITUTIONAL PROVISIONS.

Where there is a sale and resale of property to the prejudice of the homestead exemption, the question whether the parties intended merely a mortgage, and put the transaction in the form adopted, is of vital consequence, and is to be determined in each case from the facts adduced and surrounding circumstances. The declaration in article 246 of the Constitution that "the right to sell any property that is exempt as a homestead shall be preserved" is always entitled to consideration.

*(Additional Syllabus by Editorial Staff.)*

2. MORTGAGES ⬯38(1)—INTENT OF PARTIES —EVIDENCE.

On defendant's third opposition to executory process against him, oral testimony *held* to conclusively show that defendant, selling plaintiff a tract of land occupied as homestead and taking a resale from plaintiff, did not intend to enter into a contract of mortgage, especially where his debt to plaintiff was already fully secured.

Appeal from Seventeenth Judicial District Court, Parish of Vermilion; William P. Edwards, Judge.

Executory process by Mrs. Dupré Ransonet against Gustave Menard, in which he filed a third opposition. From a judgment dismissing his opposition, he appeals. Affirmed.

J. R. Kitchell, of Abbeville, for appellant.

John Nugier and J. E. Kibbe, Jr., both of Abbeville, for appellee.

Statement of the Case.

MONROE, C. J.   Plaintiff on November 21, 1914, bought from defendant and opponent a tract of land near the town of Erath containing about 40 acres, which defendant and opponent, with his wife and children, occupied as their home, the consideration for the sale being the sum of $1,600, of which $900 were paid by the surrender of the vendor's notes for that amount, and the balance in cash; and within an hour thereafter she (plaintiff) sold the same property to her vendor for $1,600, in payment of which he gave his four notes of $400 each, secured by mortgage and vendor's privilege and made payable in one, two, three, and four years, with interest.   The first maturing note not having been paid, plaintiff caused executory process to issue, under which the property was adjudicated to a third person for $1,750, and thereupon defendant filed a third opposition, alleging that the two sales constituted one contract, the purpose of which was to secure the payment of "a debt of $1,600" which he owed to plaintiff, and to circumvent and avoid the effect of the constitutional homestead exemptions; that the property in question was the homestead of himself and family; that he never intended to sell it, and plaintiff never intended to buy it; that, though his wife has since died, he is still the head of a family, having one minor child dependent on him for support. He prays that the vendor's privilege asserted by plaintiff be decreed void, and that he be paid by preference from the proceeds of the property the sum of $2,000.   Defendant alleges that the sales were made at the instance of opponent, were intended to be what they purport to be, and are valid.   The judge a quo dismissed the opposition, and

opponent has appealed. We find the facts to be as follows:

Opponent had for years borrowed money from Dupré Ransonet, and on December 10, 1913, owed him $900, for which he gave his notes for $500 and $400, respectively, payable in one year, with interest at 8 per cent. from maturity, which notes were signed, not only by opponent, but each of them by four other solvent citizens, and were therefore amply secured. In addition to that indebtedness, opponent owed $600 or $700 to other persons, and in November, 1914, in view of the approaching maturity of the notes so issued, of the fact that, unless they were paid by him, his friends who had signed with and for' him were likely to be called on, and of the further fact that his other indebtedness was embarrassing, opponent concluded to make a cash sale of his property if he could find a purchaser at $1,600, which amount he thought would enable him to pay all of his debts and leave a small balance for his own use.

Dupré Ransonet had in the meanwhile died, and his widow, an elderly lady, was living in Jeanerette, parish of Iberia, but she had formerly lived in Erath and owned a home there, and she was considering the question of going back to Erath and having her house removed from its then location to a position adjoining the residence of her son-in-law, Mansel Harrington, who, with his wife and child (or children), was engaged in the drug and (perhaps) lumber business in Erath, and who (following the death of plaintiff's husband) was attending to her business. At that juncture in their respective affairs Menard (opponent) called on Harrington, whom he knew to be representing plaintiff, and told him that he (Menard) owed considerable money, that he was being pressed and was terribly worried, and that he would like to sell his property and pay all of his debts with the proceeds; and he requested Harrington to go to Jeanerette and ask Mrs. Ransonet if she would not buy the property for $1,600, which Harrington agreed to do, with the understanding that, if Mrs. Ransonet agreed to buy, he was to receive 2 per cent. upon the price as his commission. He accordingly went to Jeanerette on the following day (Thursday) and interviewed Mrs. Ransonet, with the result that she agreed to go to Erath on the next day (Friday) or day after (Saturday) and make the purchase; one of Harrington's suggestions leading her to that conclusion being that she might occupy the Menard place as her residence in the event of her moving to Erath, and that the (say) $700 which she expected to pay for the removal of and repairs to her house (in Erath) could be devoted to, and was just the amount of cash required in, paying for that place. Menard also asked Harrington, in the event Mrs. Ransonet should ever conclude, after buying the place, to sell it again, to give him the preference, to which Harrington replied that he could not promise anything; that he did not think the old lady intended to resell the property if she did buy it, but that, if she ever decided to sell, he would try to help him out. On the next day (Friday), therefore, Menard called at Harrington's drug store and waited there for some time for the train to come in, in the hope that it would bring Mrs. Ransonet, and while waiting he had a conversation with Dr. Kibbe (a practicing physician), to whom he stated that he was selling his place; that he was waiting for Mrs. Ransonet, who was to buy it; that he had to sell it because he owed $900 in notes and $600 or $700 besides, and that, if he did not pay, his friends would have to pay for him, and, in effect, that he did not think it worth while to try to hold the place any longer and work out the debts; that it was more than he could do. On the following day (Saturday) he again appeared at the

drug store, which, as we understand the testimony, occupied part of the building in which Mr. Harrington resided, and hence was practically Mrs. Ransonet's intended stopping place.

The notary had started from his place of business with the understanding that one act of sale was to be passed, but without knowing whether it was to be for cash or on credit, and he had therefore provided himself with forms suitable for either, but it seems that he had no blanks for the making of notes, and he stopped at the bank to get some, and there met Harrington, who told him that they would not be needed as the sale was to be made for cash. He therefore went to the rendezvous without them, taking with him Dr. Kibbe and Theophile Le Blanc, whom he met at the bank, to serve as witnesses, and an unconditional act of sale was executed, duly signed by the parties (Menard by his X) and witnesses, and Mrs. Ransonet canceled Menard's two notes, gave him a check for $668, and with Menard's consent, retained $32, which she paid to Harrington as the commission which Menard had agreed to allow him. After the sale had been completed, Dr. Kibbe answered a call by Mrs. Harrington to see a sick child, and the other witness went out on the gallery to await the departure of the others, Harrington, the notary, and Menard remaining behind with Mrs. Ransonet. Harrington then asked Mrs. Ransonet whether she intended to move to Erath and into the premises that she had thus acquired, and she replied that since she had seen him she had thought a good deal about it, and, though she might possibly move on the place, she thought it would be too far out of the way, and that she would prefer, if Harrington thought it best to repair (and move) her old home, to move there, next to his place and let him attend to the property that she had bought. Harrington, however, told her that he had

145 LA.—19

decided to sell his place, and did not then know what business he would engage in or where he might find it necessary to live, and that he could not therefore be relied on to attend to her affairs in Erath. Mrs. Ransonet then said that she felt discouraged and did not know what to do, and Harrington suggested that it would be better for her to resell the Menard place, in which she acquiesced. He further told her of the request that Menard had made that he be given the preference as a buyer, and Menard, who was present, seconded that idea, and said that he would be glad to buy the place back if they would give him time to pay the price; whereupon it was agreed that Mrs. Ransonet should sell the place back to Menard for $1,600, payable in four notes of $400 each, to fall due on January 1, 1916, 1917, 1918, 1919, respectively, with interest, etc., and secured by mortgage and vendors' lien, and the act of sale was prepared and signed accordingly, after which the notary, with Harrington and Menard, repaired to the bank where the note forms were obtained and the notes executed, paraphed, and delivered (presumably to Harrington as the agent of Mrs. Ransonet), and the failure to pay, seizure, sale, and opposition followed as hereinbefore stated.

### Opinion.

Pretermitting the circumstances and the interpretation which may be placed on them by the counsel, respectively, and the court, the case as presented on behalf of Menard has no other support than his own testimony, which is in flat contradiction of the action taken by him. He signed the acts of sale by which the property was conveyed to Mrs. Ransonet and reconveyed to him, and he admits that he knew what he was doing; there being no pretense that he thought that they were other than they are, but he says that he gave Harrington and Mrs. Ransonet to

understand that he was willing to put up, and was putting up his property as security. They deny that he gave them to understand anything of the kind, and testify that his and their understanding was that he was making a sale, and, aside from their testimony, it would seem absurd that a business man, as Harrington appears to be, would permit an old widow lady, who depended on him for advice, to exchange well-secured notes for $900, and add thereto $700 in cash, for an equal amount represented by four notes with no better security behind them than a mortgage on a homestead. Menard's testimony reads in part as follows:

"I then saw Mr. Mansel Harrington * * * and spoke to him about my indebtedness, and asked if I would have to pay up or not, and he informed me that the matters would run as before Mr. Ransonet's death. I owed other people at this time also, and offered to get the money from Mrs. Ransonet to pay all my creditors and give her my place as security. It took about $1,600, including the $900 I owed Mrs. Ransonet. I intended, and said, that I would put up my land as responsible. I intended to give a mortgage. I was talking to Mansel Harrington. * * * He said a mortgage would not be good. I gave him a sale of my property, but it was not that I intended to let him have my place for $1,600. I stipulated that he would sell the place back to me for $1,600, payable in four payments of $400. The sale was passed from me to Mrs. Ransonet, and she sold back to me. * * * I spoke to Mansel Harrington about passing a sale of the land and having it passed back to me in November, before the sales were drawn up. It was all agreed that I would get my place as security before any sale was passed; that is it was agreed that I would pass a sale of my place to Mrs. Ransonet; that she would sell it back to me. She would pass me back the sale. This was before any of the sales were passed. * * * When I saw Mrs. Ransonet at Mansel's that day, knowing her, we began to talk, and I told her that I was about to put up my place for the $1,600, the $900 that I already owed and the rest which I was to borrow from her. She said it was all right. There was nothing else said between us—that is, her and me. * * *

"Q. If Mansel had bought this place at the same [sale], then, you would not now be asserting your homestead right? A. No; not if he would have done as he said. He agreed to bid $1,800, which would have acquitted me with him. I would not have claimed the homestead, although I had the right, but when he did not do what he promised, I claimed it. Q. I understand that you wanted the difference between $1,600, the amount of the sale from Mrs. Ransonet to you, and $1,800 that he was supposed to bid for the sale? A. Yes; without any lawsuit. If he had bid $1,800, that would have acquitted me with him, paid all that I owed Mrs. Ransonet, including costs, and I would have gotten my crop. As it is, I get no crop and still owe Mrs. Ransonet and Mansel."

It appears, therefore, that being advised that his proposition to give a mortgage would not be accepted (assuming that any such proposition was made), that a mortgage would not be good, he made a sale. And yet he still insists that he intended only to give his property as security. But, having admitted that, when he offered to give a mortgage, the offer was refused, and that he then made a sale, of what avail is it for him to say that he intended, in actually giving that which Mrs. Ransonet was willing to accept, to give that which she had refused to accept? What difference does it make what he intended when that which he knowingly and purposely did conflicts with his intention, mentally reserved?

It further appears that, inasmuch as the property was sold by the sheriff for $1,750, and opponent testifies that he would have filed no opposition if Harrington had bid $1,800, this litigation has arisen out of a difference between Harrington and opponent about $50, which, in all probability, would not have reached the opponent if it had been added to the bid of the adjudicatee.

Opponent is unfortunate in that no witness corroborates any of his testimony, and several of them contradicted it. Thus L. R. Landry testifies that opponent came to him in October, 1914, and offered to sell him his place for $1,500. Opponent denies that he made such an offer, and says that Landry

offered to lend him the money to pay Mrs. Ransonet, but that he declined the offer because he already had dealings with Mrs. Ransonet. Opponent denies that he ever told different persons (who were named, and some of whom were the friends who had signed his notes) that he had sold his place, and denies that he ever told any one that he had done so. Dr. Kibbe testifies that he told him on the day before the sale took place that he was selling it, and told him why he considered it better to sell it than to try to work out his then indebtedness.

Harrington also testifies, saying that Menard told him that he was pressed and "terribly worried." Hebert, a signer of one of his notes, testifies that he told him that he had sold his place. F. B. Williams, cashier of the Bank of Erath, testifies that Menard came to the bank to cash the check that he had received from Mrs. Ransonet, and told him that he had sold his place to Mrs. Ransonet, and that he intended to buy it back; that he seemed pleased. E. N. Bonvillain, constable of the town, testifies that Menard told him that he had sold his place to Mrs. Ransonet. Theophile Le Blanc, one of the witnesses to the two acts, testifies that he met Menard the next day, and that Menard told him that he had sold his place; that he was well satisfied; that it would give him a chance to arrange his affairs and pay up his debts; that he owed (money); and that it would give him a chance that would perhaps enable him to pull out. J. M. Dubois, a signer of one of his notes, testifies that he came to him and said:

"Well, I have sold my place. I am glad of it, because I will be able to pay all of my debts, and my sureties will have nothing to pay for me."

The sales here in question were made on November 21st, and the notes held by Mrs. Ransonet matured on December 10th following. Opponent had no money with which to pay them, and they were signed by eight of his friends. There were, besides, two of his notes in the Bank of Erath (which may also have borne the names of still other friends), the one for $300, and the other for $150, and in cashing the check that he had received from Mrs. Ransonet he paid the $300 note from the proceeds, and requested that the $150 note be allowed to lie over until he could see how he would come out. His need for money was therefore most urgent, and as the law gave him the right to sell his property, though not to mortgage it without the consent of his wife, it is not surprising that he should have sold it. That he was able to buy it back at once at his own price, which was no more than the pressing debts that he owed, and to substitute for those debts obligations payable in one, two, three, and four years, would appear to have been fortunate. That he was unable to meet the first of those obligations on account of the illness and death of his wife and his own illness was unfortunate. His wife, however, owned 32 acres of land quite near by, and there is evidence to the effect that he contemplated living on it, and that, while his own place was being advertised for sale, he requested Harrington to get the consent of the purchaser to the removal therefrom of one of the houses, of which he thought he could make use. He also had left some live stock, vehicles, furniture, etc.

The oral evidence in support of the contention that the sale and resale were parts of a single understanding consists of that given by opponent, upon the one hand, and that given by Mrs. Ransonet, Harrington, the notary and the witnesses to the sales, on the other hand. The testimony of opponent has been quoted. That of Mrs. Ransonet reads in part:

"Q. Was it not understood that you were to buy the property for $1,600 cash consideration, and that you were to immediately resell it to

him for the same price, but on different terms— $400 per year? A. No; when I bought the place, I expected to keep it; I intended to move upon it myself. * * * Q. It was all thoroughly understood, was it not, Mrs. Ransonet, before either sale was signed, that the property in question would be immediately resold to Mr. Gustave Menard? A. No; it was not understood that way; I bought with the intention of keeping the place, but I asked Mansel if he would take charge of the place for me, after the sale had been passed, and he said he could not, and I was much disappointed, and that is why I sold it back to Menard. Mansel advised me to sell the place if I would not move upon it. Q. When did he advise you of this, Mrs. Ransonet? A. After I had purchased the place, after the sale had been passed. Q. Did not Mansel tell you some time before the sale that Mr. Menard required that you sell him the place and give him time to pay? A. He did not tell me that when he came to see me, to buy the place. Q. I understand that you did not talk directly to Mr. Menard at all; that all the transaction concerning this transaction was done through Mr. Mansel Harrington, your son-in-law? A. I did not talk to Mr. Menard; yes, sir. Q. When was the first [time], Mrs. Ransonet, that you asked Mr. Mansel whether he could take charge of the place? A. It was after the sale was passed. Q. You never mentioned this to him before? A. No. * * * Q. Was the whole transaction drawn without interruption; none of you left the room before the whole thing was completed? A. As they came, Evy [the notary] wrote the sale and I signed it; the witness signed the sale; then the sale was over; then Mansel asked me if I intended to go live on the place. I told him I thought not. He said that, if I did not intend to live on this place, it was better for me to sell it, and I told him, if he would sell it, I was willing for him to sell it; for him to do his best. I did not occupy myself any more with it. Then Mansel took the place and transacted business with Menard. * * * Q. Was Mr. Mansel long in finding a purchaser for your property? A. No; because Menard had already asked the preference to Mansel of buying the place. Q. When had he asked it? A. I can't say; he asked that of Mansel."

The testimony of Harrington is entirely corroborative of that given by Mrs. Ransonet. The notary testifies that he came to the place with the understanding that there was to be but one act; that he met Harrington while on his way, and that Harrington told

him that the sale was to be for cash, and that he would not need forms for notes; and hence that, when the second sale was determined upon, they had to go to the bank to get the forms and execute and paraph the notes.

The witnesses (Dr. Kibbe and T. Le Blanc) testify that when the first act was signed they thought the business was done.

Considering, then, the testimony adduced on behalf of plaintiff, as compared with that given by opponent, we conclude that the two sales were not parts of the same understanding and agreement, entered into with a view to the circumvention of the homestead provisions of the Constitution, but were distinct contracts, based upon agreements entered into at different times and inspired by considerations which were wholly independent of each other, and in that respect that the case differs from the several cases in which it has been held by this court that sales and resales having for their purpose merely the conversion of an unsecured debt into a debt secured by mortgage and vendors' lien on property otherwise entitled to the homestead exemption. See Stewart Bros. & Co. v. Sutton, 48 La. Ann. 1073, 20 South. 283; Henkel v. Mix, 38 La. Ann. 271; Carroll v. Magee, 120 La. 627, 45 South. 528; Crain v. Bank, 130 La. 945, 58 South. 824; these are to be regarded as pignorative contracts, and void.

In Henkel v. Mix, supra, it was said:

"If it were true that the parties intended the contract to be one of mortgage, but they or one of them put it in the form of a sale to evade the prohibition of mortgaging a homestead, we should give effect to the intention, and let the party who tried to evade the law take the consequences."

[1, 2] The question of the intention of the parties in cases of this character is therefore one of vital consequence, and that question is to be determined in each case from the evidence adduced and surrounding circumstances. In the instant case the oral testimony,

we think, is of itself conclusive to the effect that the parties did not intend to enter into a contract of mortgage; and the circumstance that the debt which was due to the plaintiff by the owner of the property in question was already fully secured, and that she was under no necessity of changing the security, is strongly corroborative of that testimony. The declaration in article 246 of the Constitution that "the right to sell any property that is exempt as a homestead shall be preserved" is always entitled to consideration, and we are of opinion that this is a proper case in which to apply it.

The judgment appealed from is therefore affirmed.